COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, O'Brien and Athey
Argued at Fredericksburg, Virginia

**PUBLISHED**

BRIAN KUANG-MING WELSH

OPINION BY
v.        Record No. 0860-21-4          JUDGE RANDOLPH A. BEALES
AUGUST 15, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
James P. Fisher, Judge

Meghan Shapiro, Senior Assistant Public Defender (Indigent
Defense Commission, on briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, Brian Kuang-Ming Welsh was convicted of two counts of

first-degree murder and two counts of using a firearm in the commission of a felony for killing

Rishi Manwani and Rishi's mother, Mala Manwani, in the Manwanis' home on January 29,

2018.  On appeal, Welsh argues that the trial court erred by admitting the testimony of the

Commonwealth's expert witness in firearm and toolmark identification, and he also argues that

the trial court erred by limiting his cross-examination of that expert witness.  Welsh then argues

that the trial court erred by excluding the testimony of Welsh's own expert witness.  Next, Welsh

argues that his constitutional and statutory speedy trial rights were violated.  Finally, Welsh

contends that the evidence was insufficient to uphold his two convictions for first-degree murder

and his two convictions for using a firearm in the commission of a felony.[1]

---

[1] Welsh's fourth assignment of error states, "The trial court erred by admitting a recorded
conversation between Mr. Welsh, his mother, and father."  Welsh does not provide any argument

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Scott v. Commonwealth*, 292 Va. 380, 381 (2016). In doing so, the Supreme Court has stated that we must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980) (quoting *Wright v. Commonwealth*, 196 Va. 132, 137 (1954)).

Between July 2017 and January 2018, Brian Kuang-Ming Welsh spent over fifteen thousand dollars of his family's savings on drugs that he purchased from Rishi Manwani. On January 23, 2018, Welsh's financial situation worsened when he was fired from his job due to "attendance issues and performance issues." Welsh reacted so poorly to his termination that the human resources director from his former employer called the police to conduct a welfare check on Welsh. The human resources director told Welsh that she was worried about him, to which Welsh responded, "You should be worried about me." Welsh waited more than a week to tell his wife that he had been fired from his job.

On the morning of January 29, 2018, Welsh met Rishi Manwani and Rishi's long-time friend C.R.[2] at the Manwanis' home. C.R. testified that Rishi referred to Welsh as his "dumb-ass friend" and that Rishi was talking down to Welsh throughout their time together that morning. The three men then drove to the bank, with Rishi and Welsh riding together and C.R. driving separately. While they waited for the bank to open, Rishi walked into a convenience store to purchase coffee for Welsh and himself. The store's surveillance footage shows Rishi wearing a

in support of this assignment of error and, therefore, we cannot reach this assignment of error on appeal. *See* Rule 5A:20(e).

black hat, a black jacket, and black fingerless gloves at 9:54 a.m. C.R. then went inside the bank as soon as it opened at 10:00 a.m., while Welsh waited inside the car. During a police interview, Welsh stated that he noticed that Rishi had "at least three grand" in Rishi's wallet.

Welsh and Rishi then returned to the Manwanis' home while C.R. left and went elsewhere. Welsh later told the police that he and Rishi exchanged money and that he then went straight to his mother-in-law's home. At 10:31 a.m., Mala Manwani, who was working from home, sent an email to her coworkers using her home computer, but she did not respond to emails for the rest of that day or the following days. Welsh told the police in an interview that he left the Manwanis' home between 10:20 a.m. and 10:30 a.m. At 10:57 a.m. and 10:58 a.m., Welsh made two outgoing phone calls near Welsh's home. After going home, Welsh then drove to his mother-in-law's home to pick up his children. At 11:10 a.m., Welsh spoke with a job recruiter over the phone who wanted to send Welsh's application materials to an employer.

Welsh then texted his brother, Michael Welsh ("Michael"), at 12:40 p.m., stating, "Call me when you can." Nine minutes later, Welsh texted Rishi about a potential job opportunity for Rishi that Welsh allegedly learned about from the recruiter. Welsh never contacted Rishi again—either by phone call or text message—after sending this last message. Welsh eventually called his brother Michael and told Michael that "he wanted [him] to pick up a handgun that belonged to [their] father." Later that same evening, Michael came to Welsh's home to pick up a Browning Buck Mark .22 caliber pistol. Michael testified that Welsh wanted to get rid of the firearm "because his wife Amy didn't feel comfortable with guns in the house."

The next day, January 30, 2018, Welsh visited his friend K.M., who also regularly bought drugs from Rishi. K.M. testified that Welsh called her in a panic and that Welsh insisted on visiting her on very short notice. Welsh said he was concerned about Rishi's safety, and he

---

[2] We use initials in an attempt to protect the witness's privacy.

asked K.M. if she "knew anybody that would hurt Rishi." Welsh claimed that he tried to call Rishi but said that it appeared Rishi's phones were turned off. Welsh then deleted the call log on his cell phone for January 29-30, 2018, but call records from the cellular service provider show that Welsh never actually called Rishi on either day.

On January 31, 2018, the Loudoun County police entered the Manwanis' home to conduct a welfare check on Mala Manwani because her coworkers reported that she had not shown up for work and that no one had heard from her for the last two days. When the police entered the home, they found Mala Manwani dead on the floor near the front door with four gunshot wounds in the back of her head. The police went downstairs to the Manwanis' basement, where Rishi lived, and they found Rishi lying dead in an unfinished portion of the basement.[3] Rishi was still wearing the same black jacket, black hat, and black fingerless gloves that he wore to the convenience store and the bank two days before. An examination of Rishi's body showed that he was shot seven times in the head and once in the leg. The police then saw "pieces of paper that appeared to be owe sheets" around Rishi's body and Rishi's empty wallet on his chest. They also found numerous .22 caliber GemTech shell casings scattered near both Rishi's and Mala's bodies.

The police interviewed Welsh on a number of occasions prior to his arrest. On February 8, 2018, the police searched Welsh's home and found "an assault-type rifle" and a nine-millimeter handgun. In Welsh's and his wife's bedroom, the police found a significant amount of ammunition. The police also found a pack of GemTech .22 caliber subsonic ammunition. The police also saw gun cleaning supplies and various tools that could be used to work on firearms.

---

[3] C.R. testified that Rishi often exchanged drugs in the unfinished portion of the Manwanis' basement.

Shortly after the police searched Welsh's home, Welsh spoke with his brother Michael and directed Michael to give the Buck Mark .22 caliber pistol to their father because their father actually owned the firearm. Michael delivered the Buck Mark .22 caliber pistol to his parents. In the meantime, Welsh was arrested and taken into custody. While in jail, Welsh spoke on the phone with his father, and Welsh directed his father to "get rid of the soda can." Welsh's father responded by saying, "Yeah, I did. I threw it out. I took it apart and threw it out." The police later retrieved the Buck Mark .22 caliber pistol from Welsh's parents, and later testing showed Welsh's DNA on the firearm's magazine. While the police were searching the home of Welsh's parents, they found an ammunition can locked in a gun safe that contained discarded gun barrels inside of the can. None of the gun barrels inside the ammunition can matched the barrel of Welsh's Buck Mark .22 caliber pistol.

Welsh was initially released from jail when the Commonwealth moved to *nolle prosequi* his charges, but the Commonwealth then brought the same charges against Welsh on October 24, 2019, after forensic examiner Cara McCarthy ("McCarthy") examined Welsh's Buck Mark .22 caliber pistol using firearm identification testing. McCarthy also examined the GemTech shell casings found at the Manwani residence and observed the microscopic markings left on those discarded shell casings. Through her examination of the Buck Mark .22 caliber pistol and the discarded shell casings, McCarthy was able to determine with "a very high level of certainty" that Welsh's Buck Mark .22 caliber pistol was the firearm that was used to kill the Manwanis.

As trial approached, the Commonwealth indicated that Cara McCarthy would testify as an expert witness in firearm and toolmark identification. Welsh moved to exclude McCarthy's testimony at a pretrial hearing and argued that her methodology was not sound. At the pretrial hearing, McCarthy explained how her identification methodology followed the procedures dictated by the Association of Firearm and Toolmark Examiners ("AFTE"). The AFTE's

firearm and toolmark methodology involves a trained examiner viewing the microscopic "individual characteristics" that a firearm leaves on a shell casing after the casing is ejected from the gun's firing chamber. These individual characteristics are unique to that specific firearm and often differentiate that specific firearm from other firearms from the same class. In addition, McCarthy explained how one specific firearm can also leave a particular mark on a shell casing when the firing pin of the firearm strikes the shell casing.

At the same hearing, Cara McCarthy also testified that she has extensive experience in firearm and toolmark identification and that she has previously testified as an expert in many other courts throughout Virginia. Counsel for Welsh questioned McCarthy on two studies, the National Academy of Forensic Science Report ("NAS report") and the President's Council of Advisors on Science and Technology Report ("PCAST report"). McCarthy critiqued both of these reports and specifically stated that "numerous organizations and agencies have discredited the PCAST report on the grounds that they have statistical errors in their report." Ultimately, the trial court denied Welsh's motion to exclude McCarthy's expert testimony.

Welsh's trial was originally scheduled to begin on March 2, 2020; however, the parties continued the matter. On March 16, 2020, the Supreme Court of Virginia issued its first judicial emergency order to suspend all jury trials in the wake of the COVID-19 pandemic (and also toll speedy-trial deadlines). On October 15, 2020, the Supreme Court gave Loudoun County Circuit Court approval to hold jury trials. At a pretrial hearing on October 29, 2020, the trial judge indicated that the circuit courtroom still needed to be modified to hold jury trials safely. In addition, the trial judge stated that the courtroom of the circuit court would be ready to hold a jury trial safely "any date starting from January 11 through the remainder of the year" and that "this case takes priority." Welsh's trial then began on January 19, 2021.

McCarthy testified as an expert in firearm and toolmark identification for the Commonwealth on the twelfth day of the twenty-day jury trial. She explained the firearm and toolmark methodology to the jury, and she testified "with a very high level of certainty" that the shell casings recovered at the Manwanis' home were fired by Welsh's Buck Mark .22 caliber pistol. However, McCarthy then limited her conclusion by stating that "it is not with 100 percent absolute certainty" that Welsh's Buck Mark .22 caliber pistol discarded the shell casings. In addition, Cara McCarthy testified that Welsh likely replaced the barrel of his Buck Mark pistol given that the firearm showed signs of having a tool used on it to take out the barrel. Furthermore, McCarthy also testified that the GemTech brand of ammunition is not commonly used and that it is meant to be used with a silencer attached to the firearm.

Welsh's counsel then cross-examined McCarthy, and she discussed how her methodology does not have a rate of error like many other scientific fields. In addition, during cross-examination, McCarthy also discussed how a firearm could have "subclass characteristics," which are "manufacturing defects" that leave markings only on a limited number of the same class of firearms that are produced in the same period of time. Counsel for Welsh then attempted to question McCarthy on the NAS report and the PCAST report that she critiqued at the pretrial hearing, but the trial judge prevented this line of questioning because McCarthy "does not recognize the PCAST report or the NAS." Outside the presence of the jury, Welsh's counsel asked McCarthy about both reports, and McCarthy stated the studies were not standard authorities in the field of firearm and toolmark identification. McCarthy specifically stated that the PCAST report was rejected by the Department of Justice, AFTE, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

On the fourteenth day of trial, Welsh attempted to have William Tobin testify as a proffered expert witness in forensic metallurgy and material science. Welsh's attorney initially

proffered that Tobin is "going to reach an opinion regarding methods, protocols, and procedures [Cara McCarthy] used."  The trial judge then explained that he would not allow Tobin to testify because he would be "opining on the credibility of the witness" Cara McCarthy.  Welsh's counsel proffered that Tobin would explain "subclass characteristics—and how easy and why they're not easy to ascertain."  He also proffered that Tobin would "also talk about rates of error, which Ms. McCarthy said there's none in the industry."  Finally, Tobin would explain how a "metallurgist and manufacturer is a factor in" the creation of shell casings and firearms.  Welsh's counsel then explained that "Ms. McCarthy had said she didn't – did not take into consideration or she did not know how the shell casings were manufactured, the firearms were manufactured."

In a second proffer, Welsh's counsel stated that Tobin "will opine on or discuss Ms. McCarthy's worksheet and case file" and that Tobin "will explain the flaws in the methodology used in this case as to draw a conclusion."  The trial judge then stated, "I think that the entirety of what you're talking about is to attack the credibility of another witness, and that's clearly not admissible."  The trial judge then indicated that there would be a break and he told Welsh's counsel, "[I]f you talk to . . . your witness during the break and he brings some additional information to your attention that you have not already proffered that you feel meets the requirements for admission of expert testimony in connection [to] your defense, then you, by all means, may move to reconsider the Court's ruling."  After the break, Welsh's counsel told the trial court that he had already released Tobin to go home.

On February 16, 2021, the jury found Welsh guilty of all charges.  On July 20, 2021, the trial court sentenced Welsh to two life sentences for the murders of Rishi Manwani and Mala Manwani and to six years of imprisonment for the use of a firearm in the commission of each of those murders.  On January 6, 2022, more than five months after he was sentenced, Welsh moved to overturn his convictions, arguing that his constitutional and statutory speedy trial rights

had been violated.  After a hearing on the matter, the trial court denied Welsh's motion.  Welsh now appeals all of his convictions to this Court.

## II.  ANALYSIS

### A.  Statutory and Constitutional Speedy Trial

Welsh argues that "[t]he trial court violated Mr. Welsh's statutory and constitutional rights to a speedy trial when it denied a Motion to Dismiss on that basis."  On appeal, statutory speedy trial and constitutional speedy trial questions present mixed questions of law and fact. *Young v. Commonwealth*, 297 Va. 443, 450 (2019).  This Court "reviews legal questions de novo, while giving deference to the trial court's factual findings." *Id.*

"Code § 19.2-266.2 requires defendants – absent good cause – to make motions for dismissal of charges for constitutional and statutory speedy trial violations in writing within the later of seven days before trial or as soon as the grounds for the motion arise prior to trial." *Bass v. Commonwealth*, 70 Va. App. 522, 534 (2019).  Likewise, "Rule 3A:9 dictates that a motion that 'raises speedy trial' must be made 'at least 7 days before the day fixed for trial, or . . . at such time *prior to trial* as the grounds for the motion or objection shall arise, whichever occurs last.'" *Id.* at 535 (emphasis added).  "Failure to present any such defense or objection as herein provided constitutes a waiver thereof."  Rule 3A:9(b)(1).  In this case, Welsh did not raise his speedy trial motion until more than five months after he was convicted of and sentenced for the murders of Rishi and Mala Manwani.  Consequently, Welsh's motion to dismiss the indictments on these grounds was not timely filed.

Nevertheless, Welsh argues that, despite the fact that he did not file his speedy trial motion within seven days of the beginning of his trial (or even before trial at all), he has shown good cause for filing this post-sentencing speedy trial motion.  Specifically, he argues that the speedy trial tolling laws changed after he was convicted and sentenced.  In support of this

contention, Welsh relies on a memorandum opinion from this Court, *Commonwealth v. Murphy*, No. 0197-21-2 (Va. Ct. App. Aug. 10, 2021), which he alleges clarified that the Supreme Court's judicial emergency orders tolling statutory speedy trial deadlines ended in the Circuit Court of Loudoun County once the panel of the Supreme Court approved that circuit to begin holding jury trials again.

However, Welsh's interpretation of *Murphy* entirely disregards the Supreme Court's September 11, 2020 Second Clarification Order which states in pertinent part:

> This Court unanimously orders that the tolling of the running of any statutory speedy trial period applicable to criminal prosecutions in the courts of the Commonwealth of Virginia *is not affected by approval by a panel of three Justices of this Court of any plan to restart jury trials*, and this tolling of the statutory speedy trial period shall continue to be unaffected by approval of such plans, *unless amended by future order*.

(Emphasis added).

This September 11, 2020 Second Clarification Order of the Supreme Court makes it abundantly clear that, regardless of whether a panel of the Supreme Court had approved Loudoun County's plan to restart jury trials, the speedy trial deadlines remained tolled under the Supreme Court's judicial emergency orders. *See also Ali v. Commonwealth*, 75 Va. App. 16, 45 (2022) ("The cause for the delay due to the pandemic was valid, unavoidable, and outside the Commonwealth's control" in analyzing the constitutional right to a speedy trial.). Furthermore, the Supreme Court's September 11, 2020 Second Clarification Order also indicates that only an order by the Supreme Court can change the tolling of the speedy trial period. *Murphy,* which is simply a memorandum opinion by this Court, certainly is not such an order.[4] Therefore, we cannot say that Welsh has shown good cause for waiting until after he was sentenced to raise a

---

[4] Given that the decision in *Murphy* is an unpublished memorandum opinion, *Murphy* "shall not be received as binding authority." Rule 5A:1(f).

- 10 -

speedy trial motion to dismiss, given that there was no change in the law.  Consequently, Welsh

has waived his statutory speedy trial and constitutional speedy trial arguments by failing to raise

this motion seven days before his trial.  *See* Code § 19.2-266.2; Rule 3A:9(b)(1).

## B.  The Commonwealth's Expert Witness

Welsh argues that "[t]he trial court erred by denying a motion to exclude the

Commonwealth's expert Cara McCarthy from offering an opinion on firearm identification."  He

also argues that "[t]he trial court erred by *sua sponte* limiting the defense cross-examination of

the Commonwealth's expert Cara McCarthy."

"When scientific evidence is offered, the court must make a threshold finding of fact with

respect to the reliability of the scientific method offered."  *Spencer v. Commonwealth*, 240 Va.

78, 97 (1990).  "In making the threshold finding of fact, the court must usually rely on expert

testimony.  If there is a conflict, and the trial court's finding is supported by credible evidence, it

will not be disturbed on appeal."  *Id.*  In addition, "[i]t is well-established that the admission or

exclusion of expert testimony is a matter within the sound discretion of the circuit court, and we

will reverse the circuit court's judgment only when the court has abused this discretion."  *Lucas

v. Riverhill Poultry, Inc*., 300 Va. 78, 92 (2021).

The Supreme Court has long recognized firearm and ballistics testing as a reliable

method used by expert witnesses to explain how a particular firearm can leave individualized

markings on discarded ammunition shell casings.  *See Ferrell v. Commonwealth*, 177 Va. 861,

871-72 (1941).  In this case, the Commonwealth's expert witness, Cara McCarthy, testified at a

pretrial hearing that her firearm identification methodology followed the AFTE procedures—

which are widely accepted by the Virginia Department of Forensic Science.  While Welsh

attempted to discredit McCarthy's method by questioning her on two controversial reports (the

NAS report and the PCAST report), McCarthy responded by testifying that the PCAST had been

- 11 -

rejected by the Department of Justice, AFTE, and the ATF. In addition, she testified that she has extensive experience in firearm and toolmark identification, having previously testified as an expert in many other courts throughout Virginia. Given the Supreme Court's longstanding precedent allowing expert opinion testimony on firearm and toolmark identification and given that Cara McCarthy used a standard method in her field to analyze the Buck Mark .22 caliber pistol and shell casings found at the scene, we cannot say that the trial court erred by permitting Cara McCarthy to testify at trial as an expert witness in firearm and toolmark identification.

In addition, the trial court did not err when it prohibited Welsh from cross-examining McCarthy on the NAS report and the PCAST report, given that she never acknowledged either study as a standard authority in her field. Under Virginia Rule of Evidence 2:706(b), "[w]here an expert witness acknowledges on cross-examination that a published work is a standard authority in the field, an opposing party may ask whether the witness agrees or disagrees with statements in the work acknowledged." Here, McCarthy rejected the NAS report and the PCAST report as standard authorities in the firearm identification field at the pretrial hearing. Furthermore, when Welsh attempted to cross-examine McCarthy on the PCAST report during trial, McCarthy stated that "it has not been accepted. We don't use the PCAST report or refer to it in any of our methods or examination." Consequently, given that expert witness Cara McCarthy rejected both the NAS report and the PCAST report as standard authorities in the field of firearm identification, we cannot say that the trial court abused its discretion by limiting Welsh's cross-examination of the expert witness under Rule 2:706(b) in the way that the trial court did.

## C. Welsh's Expert Witness

On the fourteenth day of trial in this case, the trial court precluded Welsh from having William Tobin testify as an expert in forensic metallurgy and material science. During one of his

- 12 -

three proffers about Tobin's testimony, Welsh's counsel explained that Tobin "will opine on or discuss Ms. McCarthy's worksheet and case file" and that Tobin "will explain the flaws in the methodology used in this case as to draw a conclusion." The trial judge then stated, "I think that the entirety of what you're talking about is to attack the credibility of another witness, and that's clearly not admissible." The trial court then excluded Tobin as an expert witness because, under Virginia Rule of Evidence 2:702(b), expert "[t]estimony that is speculative, or which opines on the credibility of another witness, is not admissible." However, the trial judge also said that he was willing to reconsider and gave counsel for Welsh the opportunity to speak with Tobin over a recess so that counsel for Welsh could talk with Tobin, after which the trial judge was willing to reconsider whether Tobin could testify or add any additional information to the proffer. After the recess, counsel for Welsh informed the trial court that he had sent Tobin home.

On appeal, Welsh argues that "[t]he trial court erred by excluding the testimony of defense expert William Tobin." Specifically, Welsh argues that the trial court misapplied Rule 2:702(b). As noted above, "[i]t is well-established that the admission or exclusion of expert testimony is a matter within the sound discretion of the circuit court, and we will reverse the circuit court's judgment only when the court has abused this discretion." *Lucas*, 300 Va. at 92. However, "[a circuit] court by definition abuses its discretion when it makes an error of law." *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (alteration in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

Nevertheless, "[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). Furthermore, the Supreme Court has stated that "Code § 8.01-678 makes 'harmless-error review required in *all* cases.'" *Id.* at 200 (quoting *Ferguson v. Commonwealth*, 240 Va. ix, ix (1990)). Consequently, assuming without

deciding that the trial court erred by excluding Tobin's testimony, we review Welsh's assignment of error under the statutorily required harmless error analysis.

"An appellate court reviews a decision to admit or exclude evidence where no federal constitutional issue was raised under the standard for non-constitutional harmless error provided in Code § 8.01-678."[5] *Haas v. Commonwealth*, 299 Va. 465, 467 (2021). "A non-constitutional error is harmless when it 'plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Anderson v. Commonwealth*, 282 Va. 457, 466 (2011) (quoting Code § 8.01-678). When addressing an allegedly erroneous exclusion of evidence, the Supreme Court requires us to "consider the potential effect of the excluded evidence in light of all the evidence that was presented to the jury." *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016) (quoting *Barkley v. Wallace*, 267 Va. 369, 374 (2004)). In addition, any alleged evidentiary "error is harmless where 'other evidence of guilt is so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict.'" *Smith v. Commonwealth*, 72 Va. App. 523, 543 (2020) (quoting *Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017)).

Here, Welsh certainly "had a fair trial on the merits," given that he was still able to extensively question Cara McCarthy's conclusions on firearm and toolmark identification even without Tobin's testimony. Code § 8.01-678. Welsh proffered that Tobin would have discussed the topics of subclass characteristics, the lack of a rate of error in McCarthy's methodology, and

_____

[5] Welsh argues that the test for constitutional harmless error should apply in this case. However, Welsh did not raise any constitutional argument for this issue at trial. Furthermore, the ends of justice exception to Rule 5A:18 does not apply in this case because Tobin's testimony would *not* have "affirmatively prove[n] that an element of the offense did not occur." *Redman v. Commonwealth*, 25 Va. App. 215, 222 (1997). Welsh only argues in his reply brief that "the jury would have had good reason to question McCarthy's conclusion that Mr. Welsh's firearm matched the crimescene evidence" if Tobin had testified. Consequently, we may only conduct a non-constitutional harmless error analysis, given that Welsh has waived his constitutional arguments under Rule 5A:18.

the influence of metallurgy on the shell casing and firearm manufacturing processes. However, McCarthy admitted in the earlier cross-examination of her that, unlike many other scientific disciplines, her methodology does not have a rate of error. Furthermore, counsel for Welsh cross-examined McCarthy on the topic of subclass characteristics. In addition, Welsh agreed that McCarthy had stated during cross-examination that "she did not take into consideration or she did not know how the shell casings were manufactured." Finally, the jury also heard McCarthy limit her own testimony by stressing that her opinions were "not with 100 percent absolute certainty." In short, the jury was made aware of the limitations in the Commonwealth's expert witness Cara McCarthy's testimony. The jury heard counsel for Welsh question McCarthy's findings, and the jury even heard McCarthy limit her own testimony. However, the jury still found Welsh guilty beyond a reasonable doubt.

Indeed, the jury found Welsh guilty of two counts of first-degree murder and two counts of using a firearm in the commission of a felony because the evidence of Welsh's guilt was overwhelming. The evidence showed that Welsh murdered Rishi Manwani around 10:30 a.m. on January 29, 2018, in the Manwanis' basement by shooting Rishi seven times in the head. Before leaving the Manwanis' home, Welsh went upstairs and murdered Mala Manwani presumably in order to eliminate any potential witness to his crime.

The evidence presented to the jury shows that, in the months leading up to the murders, Welsh found himself in financial and emotional turmoil. Welsh admitted in a series of police interviews that he used his family's savings to purchase over fifteen thousand dollars of drugs from Rishi. In addition, Welsh's financial and emotional state significantly spiraled downward when he was fired from his job only a few days before the murders took place. The human resources director of Welsh's former employer testified that Welsh was so distraught that he told her, "You should be worried about me." Furthermore, the jury certainly could have inferred that

Welsh was deeply affected by the loss of his job, given that he did not tell his wife about his termination until a few days after the murders took place.

Welsh told the police that he was in the Manwanis' home on the morning of the murders to buy more drugs from Rishi. Rishi's friend, C.R., testified that he went to the bank with Rishi and Welsh that morning and that only Welsh and Rishi returned to the Manwanis' home afterward. Welsh admitted in a police interview that he saw that Rishi had about three thousand dollars in cash in his wallet when they left the bank. When the police found Rishi's dead body in the Manwanis' basement, Rishi's wallet was empty and lying on his chest. In addition, Rishi was still wearing the same clothes that he wore to the bank two days earlier when he was with Welsh.

Given Welsh's behavior after the murders took place, the jury certainly could have inferred a consciousness of guilt. *See Emmett v. Commonwealth*, 264 Va. 364, 372 (2002) (holding that a defendant's prior inconsistent statements are relevant to showing a consciousness of guilt). Shortly after leaving the Manwanis' residence, Welsh texted Rishi about a fictional job opportunity that Welsh's recruiter had supposedly just found for Rishi. However, Welsh's recruiter testified at trial that she had only discussed Welsh's potential job prospects with Welsh—not any additional job openings for anyone else, including Rishi.

In addition, the day after the murders, Welsh visited his friend K.M.—a mutual friend of Rishi and Welsh—on short notice and in a state of panic. Welsh asked K.M. if she "knew anybody that would hurt Rishi." Welsh then told K.M. that he had tried to call Rishi multiple times since being with him the day before. However, phone records show that Welsh never called Rishi after January 29, 2018. Welsh also never texted Rishi after January 29, 2018, and Welsh even deleted the entire call log on his cell phone for the day of the murders and the following day—i.e., January 29 and 30, 2018.

Welsh also attempted to hide his Buck Mark .22 caliber pistol from the police after the murders. Two hours after leaving the Manwanis' home, Welsh texted his brother Michael to ask Michael to take the Buck Mark .22 caliber pistol. Later that same evening, Welsh gave Michael the Buck Mark .22 caliber pistol, stating that his wife did not want guns in the home. However, Welsh did not also hand over the numerous other firearms (and ammunition) from his home (that he shared with his wife), which the police then found during their search of the Welsh residence. When Welsh discovered that the police were looking for the Buck Mark pistol, Welsh directed his brother to give the firearm to their father.

Further examination of the Buck Mark pistol showed that its barrel had likely been replaced. The jury could reasonably conclude that Welsh had directed his father to take apart the gun's barrel and then get rid of the barrel that was used in the murders. The Commonwealth also played a recorded jail phone conversation between Welsh and his father where Welsh told his father to "get rid of the soda can." Clearly understanding that Welsh was not referring to an actual soda can, Welsh's father responded, "Yeah, I did. I threw it out. *I took it apart and threw it out*." (Emphasis added). Welsh knew that the police were about to search his father's home to recover the Buck Mark .22 caliber pistol. Welsh also knew that his father kept discarded gun barrels inside of an ammunition can at his home. Consequently, the jury could reasonably conclude that Welsh directed his father to take apart and discard the used gun barrel from the Buck Mark .22 caliber pistol, and the jury could also conclude that Welsh's father complied.

When the police eventually obtained the Buck Mark .22 caliber pistol, the Commonwealth's expert witness, Cara McCarthy, was able to link the firearm to the crime scene. McCarthy testified that .22 caliber bullets were recovered from Rishi and Mala's bodies after their autopsies. Numerous .22 caliber GemTech brand shell casings were found near Rishi's and Mala's bodies. In addition, McCarthy also testified that GemTech subsonic

ammunition is a rare brand of ammunition that is often used with a silencer attached to the firearm. She then analyzed the markings left on the .22 caliber GemTech shell casings that were found at the Manwanis' home. After examining the individual markings that the chamber and firing pin of Welsh's Buck Mark .22 caliber pistol left on newly discarded shell casings, McCarthy was able to conclude "with a very high level of certainty" that the shell casings recovered at the Manwanis' home were fired by the same firearm that Welsh had tried to hide from the police.

In short, assuming without deciding that the trial court erred in excluding the testimony of William Tobin, any alleged error was harmless in light of the limitations on the Commonwealth's expert witness Cara McCarthy's own testimony—and especially in light of the overwhelming evidence of Welsh's guilt presented at trial. However, while Tobin would have testified as to the limitations of McCarthy's methodology, given that counsel for Welsh had the opportunity to cross-examine McCarthy as to those very same limitations and given that McCarthy testified that she accounted for those limitations, any such error was harmless. Therefore, we conclude that Welsh certainly had "a fair trial on the merits." Code § 8.01-678. In addition, "substantial justice has been reached," given that the Commonwealth put on an overwhelming amount of evidence showing that Welsh had a motive to kill Rishi and Mala Manwani, proving that Welsh was at the crime scene on the morning of the murders, and demonstrating that Welsh showed a significant consciousness of guilt after the murders took place. Code § 8.01-678. Therefore, even if the trial court erred in preventing William Tobin from testifying as an expert witness, any error was harmless.

## D. Sufficiency of the Evidence

Finally, Welsh argues that the trial court erred in finding that the evidence was sufficient to support his two murder convictions and his two convictions for use of a firearm in the

commission of a felony. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). In addition, "[t]here is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005). "Circumstantial evidence is not viewed in isolation. While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Id.*

As discussed *supra,* the Commonwealth put on an overwhelming amount of evidence to prove Welsh's guilt. In January 2018, Welsh's emotional and financial stability were spiraling downward after he was fired from his job. In addition, Welsh told the police that he had spent thousands of dollars of his family's savings on drugs that he purchased from Rishi Manwani. On the morning of January 29, 2018, Welsh saw that Rishi had about three thousand dollars in cash in his wallet. When the police found Rishi's dead body, they saw an empty wallet lying on Rishi's chest. The police also saw that Rishi was wearing the same clothes and gloves that he wore when he went with Welsh to the bank two days before. Welsh also told the police that he left the Manwanis' home around the time that Mala Manwani had sent the final email to her coworkers that she would ever send.

- 19 -

Shortly after leaving the Manwanis' home, Welsh texted his brother in order to give his brother the firearm that was later shown to be the firearm that had just been used in the murders. Welsh told his brother that his wife did not want firearms in their home. However, the police found multiple firearms throughout the Welsh residence when they searched the residence after obtaining a search warrant. In addition, Welsh later directed his brother to give the firearm to their father, and yet later directed his father to take apart and throw away the barrel of the firearm (which Welsh's father acknowledged that he did). Welsh further exhibited a consciousness of guilt when he told his friend K.M. that he had called Rishi multiple times, but the cell phone provider's records show that Welsh never actually called Rishi after the murders. Welsh also deleted the entire call log on his cell phone for the day of the murders and the following day.

Furthermore, Welsh was also in possession of the same type of ammunition that was used to kill the Manwanis—a unique brand of ammunition that is often used with a silencer attached to the firearm. In addition, the Commonwealth's expert witness was able to determine "with a very high level of certainty" that Welsh's firearm was used in the murders, given the individual characteristics that were left on the shell casings found near the Manwanis' bodies. Consequently, given the overwhelming evidence of Welsh's guilt, we certainly cannot say that no rational factfinder could have found the evidence sufficient to convict Welsh of using a firearm to murder both Rishi Manwani and Mala Manwani.

## III. CONCLUSION

For all of the foregoing reasons, we do not disturb the judgment of the trial court.

*Affirmed*.